**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Meshelle Lynch, et al.,** | ) | **CASE NO.  1:08 CV 1341** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **City of Cleveland, et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendant.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendants City of Cleveland, Michael McGrath, Albert D. Oliver, and Robbie L. Durbin's Motion for Summary Judgment (Doc. 49) and defendants' Motion to Strike (Doc. 55).  This is a § 1983 action.   For the following reasons, the Motion for Summary Judgment is GRANTED and the Motion to Strike is GRANTED IN PART.

<u>**Facts**</u>

Plaintiffs, Meshelle Lynch (hereafter, Lynch), Shaleah Combs (a minor) (hereafter, Shaleah or Combs) (collectively hereafter, plaintiffs), and Mark Wright, filed this Complaint

1

in the Cuyahoga County Common Pleas Court against defendants, City of Cleveland, Albert D. Oliver, Robbie L. Durbin, Daniel Banach, Michael McGrath, Marcia Masters, and the City of Bratenahl.[1]  The matter was then removed to this Court on the basis of federal question jurisdiction.  Thereafter, Defendants Bratenahl and Masters were dismissed, as well as all claims asserted on behalf of plaintiff Mark Wright.  Defendant Banach, who retired from the Cleveland Police Department subsequent to the incident giving rise to this lawsuit, was never served with the Complaint.

The Complaint contains two causes of action entitled "Federal Causes of Action" and "Pendent Causes of Action."  The federal claims allege deprivation of plaintiffs' rights

> including, but not limited to, their [F]irst amendment right to freedom of expression, their  Fourth Amendment right to be free from unlawful seizure of their person, their Fifth and Fourteenth Amendment rights to due process of law, including the right to be free from unjustified and excessive force utilized by police, and their Eighth Amendment right to be free from cruel and unusual punishment.

The pendent claims assert state law allegations of false arrest and imprisonment, assault and battery, malicious prosecution, abuse of process, negligence, and gross negligence.

In general, the facts giving rise to this Complaint are as follow. [2]

According to plaintiff Shaleah Combs, who was 16 years old at the time, on May 8, 2007, she was walking to a Convenient store on East 140th in Cleveland, Ohio.  Shaleah encountered her cousin Darrell who told her that he had been "jumped" by a person named Aaron, with whom Darrell had had a "running dispute."  Shaleah then told her cousin,

---

[1]  An Unnamed City of Cleveland Police Officer was also named as a defendant, but was never identified or served with the Complaint.

[2]  The facts are taken from deposition testimony and verified exhibits.

Redrick Ward, who was driving by, about the incident.  Ward told Shaleah and Darrell to get

in his car, and that they were going to talk to Aaron. The three proceeded to an apartment

building located at 554 East 140th Street, where Aaron lived.  Upon arrival, Ward got out of

the car and asked an old man sitting on the porch as to the whereabouts of Aaron.  Ward and

the man began arguing.  The man then ran into the backyard of the apartment and returned

with a stick.  Ward then got a baseball bat from the trunk of his car, climbed onto a balcony of

the building and broke a window.   The man left and returned with a gun.  Ward and the man

began to wrestle over the gun and a couple gun shots were fired into the air.   (Shaleah Combs

depo.)

At one point, Shaleah called her stepfather, Xavier Lynch, an off-duty Cleveland

Police Officer, and told him there was shooting at that location.  (Xavier Lynch depo.)

In the meantime, the Cleveland Police Department received several calls from

residents of the area reporting that a group of juveniles, armed with sticks, bricks, and bats,

was trying to break into the apartment building to assault someone.  (Doc. 49 Ex. D-1; Doc.

51)  About 8:20 p.m., Cleveland Police Radio dispatched a broadcast to that effect and

identified the apartment's location as 554 East 140th.  (*Id.*)  Defendants, Cleveland Police

Officers Albert D. Oliver and Robbie L. Durbin, and then Officer Daniel Banach responded to

the radio call. Officers Oliver and Durbin heard a gunshot while en route to the disturbance

and broadcast over their radio that a shot had been fired in the area.(Daniel Banach depo. 9;

Albert Oliver depo. 10-11; Robbie L. Durbin depo. 12)

Officers Oliver and Durbin were first to arrive on the scene, almost immediately after

receiving the dispatch.  Banach arrived shortly thereafter.  (Banach depo. 9; Doc. 49 Ex. D-1)

According to Oliver and Durbin, when they initially arrived they observed "a lot of commotion," with numerous people running, screaming, and pointing.  (Durbin depo.; Oliver depo. 12) They observed Ward hiding under a balcony with a baseball bat.  Ward was arrested and placed in the police car without incident.  (Oliver depo. 12-13)

According to a witness, a large crowd had gathered.  (Salice Hartfield depo. 23) Oliver had begun to interview a witness when he heard Shaleah yelling and pointing in an agitated manner.  Oliver was concerned because the crowd had been calmed somewhat and Ward had been secured, but it was still undetermined as to where the gun shots had originated.   Oliver did not want Shaleah to "incite another problem" so he yelled to the other officers to put her in the back of the police car.  (Oliver depo. 14-16)

Banach testified that Shaleah was inciting more chaos between the crowds gathering on the sidewalks and the balconies of the apartment building.  He considered her to be "escalating a situation that at the time the three of us were trying to contain and control."  As a result he told Shaleah to sit in the police car, and she complied.  Shaleah could not exit the police car on her own because the back doors on a police car cannot be opened from the inside. (Banach 11-12, 15-17)

Shaleah testified that she asked Officer Banach several times whether she could get her phone from Ward in the police car, but Banach repeatedly told her to go home.  Banach eventually took her to the police car and put her in the back.  She was not handcuffed, but she stated that Banach made her bump her head on the car while getting in and called her a "little black bitch."  She did not receive medical care. (Combs depo. 31-33)

According to plaintiff Meshelle Lynch, she received a phone call while at work as a

registered  nurse at Metro Hospital on May 8, 2007 around 8:30 p.m. from her niece, Shirell.

Shirell was "screaming in the phone saying, Shelle, you got to come home, hurry up and

come home, Darrell got jumped and they're shooting guns outside."  Shirell did not mention

Shaleah.  Lynch went directly to her charge nurse and told her that she had to leave due to a

family emergency.  After getting permission, she left the hospital and drove "expeditiously"

toward the scene.  Lynch first stopped at East 140th and Othello where she saw Shirell who

told Lynch that Shaleah was in a police car.  Lynch then pulled her vehicle, a green Jeep

Commander, up to the scene and parked it facing northbound in the southbound lane.  Lynch

states that she parked in front of a police car.  She then approached the two police officers,

Oliver and Banach.  Officer Oliver immediately told her to move her car, but Lynch told him

she was looking for her daughter.  Lynch testified that Oliver "said like I said, you need to get

in your car and get out of here and in so many words I told him that he didn't need to speak

with me in that manner, my child is a juvenile, I will move my car in minute. I just wanted to

make sure my daughter was okay and that he did not need to speak to me in that tone."  And,

Oliver "said that he could speak to me any f- ing way he wants to and I told him just because

he was a police officer wearing that badge does not give him the right to disrespect me.  I

didn't know who he thought I was but I am here looking for my child."  Further,

> And I remember him saying I don't give a f- if you were the mayor of the city, I will
> talk to you any f- ing way I want to.  And I told him no, he would not, and I remember
> trying - - at that point I turned to walk off.  He was still yelling at me and I turned to
> walk off and when I like left him standing there he pushed me and then like pushed
> me and then tried to like yank my arm and I yanked my arm from him and I told him
> he is not to touch me.

According to Lynch, Officer Banach then grabbed her arm from the other side. Lynch then

heard Officer Oliver tell her that "you're under arrest."  Lynch said, "[F]or what, I didn't do

5

nothing wrong, I'm looking for my daughter." Lynch may have pulled away again. Lynch was then taken to the ground after she was handcuffed. While she was screaming that the handcuffs were too tight, she felt a bony object, a knee, or something on her back. She believed that it was Officer Banach pushing on her back. This caused Lynch to urinate. Lynch then felt Officer Banach grab the back of her hair and ram her head into the concrete. She knew it was Banach because she turned around to see who did this. When she turned around, Banach was "down on [her] back," and Oliver "had already gotten up after he had handcuffed" her. Officer Banach then got Lynch off the ground and placed her in a police car. At her request, Lynch was then moved by two other police officers who had arrived on the scene to the police car with her daughter. Her handcuffs were also loosened. Lynch was then taken outside that car and was standing outside the police car when the Cleveland EMS ambulance arrived. Lynch was attended to immediately by EMS personnel. She was then transported to Euclid Hospital where she was treated. Lynch could not recall any instance where Officer Durbin had any physical contact with her. (Meshelle Lynch depo. 27, 35, 38-75)

The evidence shows that EMS was dispatched to the scene at 8:57 p.m. and arrived on the scene at 9:06 p.m. Lynch was assessed by EMS personnel and transported to the hospital. The EMS report notes that "on scene time and pt [patient] care were delayed due to multiple persons arguing with cpd officers on scene causing a delay to ems crew providing care to pt." (Doc. 49 Ex. M, M-1)

According to Officer Oliver, after Ward had been arrested and Shaleah placed in the police car, he was interviewing witnesses to figure out what had happened on the scene. At

6

one point, he crossed from the east side of the street to the west side of the street.  He was

near his police car in order to keep it in sight inasmuch as he had an arrested male inside and

wanted to make sure he was secure.  Oliver was speaking with Banach about what they had

learned about the incident.  A green Jeep driving northbound, crossed over into the

southbound land.  It was driving faster than the posted 25 mile per hour speed limit as it

pulled up.  The Jeep stopped in the middle of the street and a female (Lynch) exited.

According to a witness, Lynch "drove up on the wrong side of the street, jumped out and she

started screaming... and she walked right over to the police officers, was getting in their face

and yelling..."  (Hartfield depo. 24-25) Oliver further testified that Lynch was walking briskly

toward him in an agitated manner.  And,

> She approached myself and Banach.  And Banach asked her to identify herself and she
> refused.  And I told her, I said, 'Ma'am, you need to move your car and park it
> legally.'  And then, she got really mad, yelling, 'You don't know who you are talking
> to.  You can't talk to me that way.'  And I said, 'Ma'am, I just need you to move your
> car and to calm down.' She just continued.  Now, she is waving her arms and pointing
> at my face.

Oliver told her that she needed to move her car and calm down, or she would be arrested.

Lynch told Oliver that "you can't arrest me.  You don't know who I am.  You don't know

who [you] are messing with."  At this point, Lynch did not tell Oliver that she was looking for

her daughter.  Nor did she identify herself.  Oliver told Lynch that he did not care who she

was but that she had to move her car.  Oliver recalled "saying something, I didn't care, if she

was the Mayor."  Lynch became more agitated and refused to obey Oliver's orders.  The

officers told Lynch she was going to jail if she did not desist her disorderly behavior.  Oliver

testified that Lynch began "walking further west into the crime scene there. At which time, I

grabbed one of her arms. I would believe it was her left. I would -- like, from my perspective,

7

she was on the right side. And just by, like, the elbow, and told her. She couldn't go over there, and she needed to stop. At which time she jerked her arm away from me and pulled away." Banach was on the other side of Lynch.  Oliver then advised Lynch that she was under arrest.  Oliver did not tell Lynch the charges for which he was arresting her, but stated at deposition that he was arresting her for obstruction of official business. Oliver grabbed her arm again and she pulled away again.  Oliver then attempted to manipulate Lynch's arm behind her back, and she grabbed him with her fingernails.  Banach was trying to get her other arm.  At one point she fell to the ground.  Oliver told her to stop resisting.  Lynch responded, "You can't arrest me.  I'm not going to jail.  You don't know who I am.  You can't do this to me."  Lynch was still struggling on the ground and the officers had to take her arms and place them behind her back.  Oliver used a "joint maneuver technique" to handcuff Lynch.  She was still yelling and struggling after the handcuffs were on.  Oliver and Banach then stood Lynch up and another officer took her to the police car.  Lynch was arrested by 8:42 p.m.[3] (Oliver depo. 31-46, 78; Doc. 49 Ex. D-1)

At that point, Mark Wright arrived on the scene and began yelling at the police officers that his aunt was being arrested.  Officer Durbin advised him several times to leave the area.   Office Oliver then noticed that the steering column on Wright's vehicle had been "peeled."  As a result Wright was asked for his license and registration.  When he refused, he was placed under arrest.  (Durbin depo. 30-31) Wright was arrested by 8:42 p.m.   (Doc. 49 Ex. D-1)

---

[3]      The Dispatch transcript shows that, in accordance with police procedure, a request for a supervisor was made at 8:42 p.m.  Both Mark Wright's and Meshelle Lynch's license plates were run at 8:43 p.m.

Officers Jonathan Smith and Eduardo Colon responded to the scene to assist the other officers in lifting Lynch from the ground.  After Lynch was placed in the zone car, Smith and Colon immediately went to assist with the arrest of Mark Wright, a "disorderly male."  (Smith depo. Ex. 1)  After Wright was placed under arrest, Smith and Colon returned to the police car and loosened Lynch's handcuffs.  (Lynch depo. 54; Colon depo. 21-22)

Oliver further testified that as he was running Lynch's license plate, he heard the listing come back to Meshelle Lynch.  At that point, he saw Xavier Lynch (hereafter, Xavier) respond to the scene.  Oliver knew Xavier to be a Cleveland Police Officer, but did not know previously that Lynch was Xavier's ex-wife.  But, with the information received on the police radio and seeing Xavier on the scene, Oliver figured they were related.  Xavier approached Oliver who told Xavier that "there is nothing he could do here.  He needed to leave."  Xavier had talked to Lynch and Xavier told Oliver that he needed to call an ambulance because Lynch's wrists were hurting.  Oliver told Xavier that Lynch would be transported to the hospital if she was in pain.  Xavier told Oliver that he was "going down" for refusing Lynch medical attention.  (Oliver depo. 25, 50-52)

According to Xavier, on May 8, 2007, he was employed as a Cleveland Police Officer, but was not on duty and was dressed in civilian clothes.  At that time, Lynch was his ex-wife.  On that date, Xavier received a telephone call from Shaleah, his stepdaughter, that there was shooting at the location and so he reported to the scene.[4]  Xavier arrived and recognized the three  Cleveland Police officers.  He approached Officer Durbin and then Oliver to ask what

---

[4]     Xavier called Cleveland Police Dispatch to report the shooting and requested a police car at the location.  (Doc. 51)

had happened.  Xavier felt that he was met with hostility by the officers.  Officer Oliver told

him to leave, and the two then began shouting at each other.  Xavier also talked with Lynch

who told him what had happened.  Xavier was ultimately disciplined by the Cleveland

Division of Police for his conduct at the scene. (Xavier Lynch depo. 6, 16, 28-30, 40, 80-83;

Doc. 49 Ex. J-3).

Defendants state that the prosecution intended to charge Lynch with Obstructing

Official Business, Aggravated Disorderly Conduct, and Resisting Arrest, but that due to a

clerical error, she was mistakenly charged with Obstructing Official Business and two counts

of Resisting Arrest. The mistakenly filed charges were dismissed and the prosecutors

attempted to re-file the proper charges. However, due to the lapse of time, the case was

dismissed. (Doc. 49 at 11-12)

This matter is now before the Court upon defendants City of Cleveland, Michael

McGrath, Albert D. Oliver, and Robbie L. Durbin's Motion for Summary Judgment.

### **Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and

the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates
> the absence of a genuine issue of material fact.

10

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the

11

legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Motion to Strike**

Defendants argue that portions of Lynch's and Combs's affidavits are inconsistent with their prior deposition testimony and should be stricken. Defendants also assert that medical records attached to Lynch's affidavit are not authenticated and cannot be considered.

In determining the admissibility of a post-deposition affidavit, this Court "must first determine whether the affidavit directly contradicts" plaintiffs' prior deposition testimony. "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006) (citations omitted). Where there is no direct contradiction, the Court considers the affidavit unless it "constitutes an attempt to create a sham fact issue." *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567 (6th Cir. 2009) (citing *Aerel, S.R.L.*).

Defendants assert that Lynch's affidavit attempts to ascribe certain conduct (pushing on her back) to the police officers in general, while her previous deposition testimony attributed the conduct to Officer Banach only. The Court declines to address this issue in that, as discussed below, Lynch's excessive force claim relates to her handcuffing only.

Defendants also contend that Lynch attempts to incorporate medical records into her affidavit, although she is not qualified to do so. Plaintiffs have now submitted authentication of some of the records. (Doc. 59) Defendants also assert that Lynch attempts to aver as to a

medical diagnosis and causal connection.  Although Lynch is not qualified to establish medical causation, the Court has considered Lynch's averments that she continued to suffer pain after the handcuffs were removed.  Nonetheless, as discussed below, even if the Court assumes that the handcuffs caused an injury to Lynch, there was no constitutional violation.

Finally, defendants point out that Shaleah Combs's affidavit attempts to ascribe certain conduct to all the officers where she had previously testified that only Officer Banach was at fault.  This Court agrees and strikes the affidavit to the extent it directly contradicts Shaleah's deposition testimony, as discussed herein. [5]

**(2) Motion for Summary Judgment**

The Complaint alleges violations of plaintiffs' First amendment right to freedom of expression; Fourth Amendment right to be free from unlawful seizure; Fifth and Fourteenth Amendment rights to due process of law, including the right to be free from unjustified and excessive force; and Eighth Amendment right to be free from cruel and unusual punishment. It also alleges violations of state law.

Plaintiffs's opposition brief makes clear that they are pursuing the following claims: excessive force as to plaintiff Meshelle Lynch based on injury resulting from the handcuffs, malicious prosecution and false arrest as to Meshelle Lynch, and unlawful arrest and assault and battery as to plaintiff Shaleah Combs.

**(a) Individual Defendants**

---

[5]     Appended to their response to the City's Motion to Strike, plaintiffs have submitted two new witness affidavits.  The Court will not consider these untimely affidavits.  Even if the Court were to consider them, they do not alter this Court's decision.

Officers Durbin and Oliver raise the defense of qualified immunity.  The Sixth Circuit recently recognized the three-part procedure for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Moldowan v. City of Warren,* --- F.3d ----, 2009 WL 2497969 (6th Cir. August 18, 2009 ) (citations omitted). This Court, then, first determines whether, "[t]aken in the light most favorable to the party asserting the injury, ...the facts alleged show the officer's conduct violated a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Only if a violation could be made out does the Court proceed to consider whether the right was "clearly established."

In *Moldowan*, the court additionally noted the Supreme Court's decision in *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808 (2009), and stated that "we still are required to address the same questions in conducting our qualified immunity analysis, but now we are free to consider those questions in whatever order is appropriate in light of the issues before us."

Once defendants raise the qualified immunity defense, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."  *Moldowan*, 2009 WL 2497969 at *14 (citations omitted).

### (i) Durbin

Defendants contend that Durbin committed no constitutional violation based on the testimony of plaintiffs Lynch and Combs who stated that Durbin had no involvement in the use of force or seizures.  This Court agrees.

14

As discussed above, Lynch testified that Officer Oliver told her to move her car, pushed her, grabbed her arm, told her she was under arrest, took her to the ground, and participated in handcuffing her.  Officer Banach grabbed her arm, participated in handcuffing her, pushed on her back, grabbed her hair**,** and pushed her head into the concrete. Lynch further testified that she could not remember any physical contact that Durbin had with her. Shaleah testified only that Banach made her bump her head on the police car while he was putting her into the car.

Plaintiffs contend that Durbin is liable based on his testimony outlined as follows: Durbin was the senior officer who was conducting an investigation at the scene.  He was about 10 to 15 feet from Lynch when she arrived at the scene in her Jeep. Durbin walked with the other officers when they placed Lynch in the zone car.  Durbin had knowledge that handcuffs which are double-locked will not "tighten up on the person." He did not know whether Lynch's handcuffs were double-locked, but he was not involved in her arrest. Durbin was informed by somebody at the scene that Lynch was complaining that her wrists were hurting.   (Durbin depo. 59, 19, 28, 32-33, 69) Based on this testimony, plaintiffs assert that Durbin "stood by and allowed" the other officers to violate Lynch's constitutional rights; he did not check or loosen the handcuffs or prevent her injury due to the handcuffs; and he knew of the policy regarding double-locking the handcuffs, yet did not follow it.

With regard to Shaleah, plaintiffs assert that the actions of Banach were in Durbin's "direct view." Plaintiffs, however, only point to Durbin's testimony that he noticed her in the zone car.  (*Id.* 25, 64) Durbin further testified that he did not see Shaleah being arrested or placed in the zone car.  (*Id.* 25)

15

For the following reasons, Durbin is entitled to summary judgment.

The Sixth Circuit has held that "even if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Cardinal v. Metrish*, 564 F.3d 794 (6th Cir. 2009) (citing *Combs v. Wilkinson,* 315 F.3d 548, 558 (6th Cir.2002) ).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.*   Additionally, "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir.2006) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir.1999)). "A plaintiff must show that a supervising officer did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Walters v. Stafford*, 317 Fed.Appx. 479 (6th Cir. 2009) (citations omitted). "Nor can the liability of supervisors be based solely on the right to control employees, or simple awareness of employees' misconduct." *Id.*  Where, at best, the record supports an inference that the supervisor was aware of the activities at the scene and failed to act, there is an insufficient showing that he implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of offending officers. *Id.*

As demonstrated above, the record shows that Durbin did not directly participate in any of the officers' actions taken toward either of the plaintiffs. Nor is there evidence that Durbin implicitly authorized their conduct.  If anything, the testimony shows only a failure to act where Durbin may have been aware of the actions of Oliver and Banach.

16

Accordingly, viewing the evidence in plaintiffs' favor, there is no evidence of any

constitutional violation on Durbin's part.  Summary judgment in his favor is warranted.

### (ii) Oliver

### (a) plaintiff Lynch- excessive force

Plaintiffs allege an excessive force claim under the Fifth, Fourteenth, and Eighth

Amendments.  (Compl. ¶ 25) While plaintiffs alleged only an unlawful seizure under the

Fourth Amendment, Lynch's excessive force claim arises under the Fourth Amendment as

well.[6]  The law is clear that with regard to excessive force, the Eighth Amendment applies

only to plaintiffs who are convicted prisoners at the time of the incident.  Where, as here, the

plaintiffs are free persons, and the use of force occurred in the course of an arrest or other

seizure, the claim arises under the Fourth Amendment and its reasonableness standard.

*Lanman v. Hinson*, 529 F.3d 673 (6th Cir. 2008) (citations omitted).

The excessive force analysis is well-established:

Whether a law enforcement officer's use of force is reasonable requires a careful
balancing of the nature and quality of the intrusion on the individual's Fourth
Amendment interests against the countervailing governmental interests at stake.  In
other words, [the court considers] the risk of bodily harm that the officer's actions
posed in light of the threat to the public that the officer was trying to eliminate.
Reasonableness is judged from the perspective of the reasonable officer on the scene,
rather than with the 20/20 vision of hindsight.  As we have explained:

Not every push or shove, even if it may later seem unnecessary in the peace of
a judge's chambers' violates the Fourth Amendment. The calculus of
reasonableness must embody allowance for the fact that police officers are
often forced to make split-second judgments-in circumstances that are tense,
uncertain, and rapidly evolving-about the amount of force that is necessary in a
particular situation.

---

[6]     Plaintiffs argue in their brief that Lynch has a Fourth Amendment right not to be
handcuffed so tightly as to cause injury to her wrists.

17

In conducting this 'reasonableness' analysis, this court has often looked to: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the police officers or others, and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight...

Gratuitous violence is never reasonable...On the other hand, significant government interests can justify even fairly substantial physical intrusions.

*Walters v. Stafford*, 317 Fed.Appx. 479 (6th Cir. 2009) (citations and quotation marks omitted).

Plaintiffs point to *Lyons v. City of Xenia*, 417 F.3d 565 (6th Cir. 2005) and the Tenth Circuit decision of *Vondrak v. City of Las Cruces*, 535 F.3d 1198 (10th Cir. 2008).

In *Lyons,* the Sixth Circuit recognized, "The Fourth Amendment, it is true, prohibits unduly tight handcuffing in the course of an arrest.... Not all allegations of tight handcuffing, however, amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing, and must show that officers ignored plaintiff's complaints that the handcuffs were too tight." *Id.* at 575-576 (citations omitted). Similarly, *Vondrak* stated, "In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight. ... [the] claim requires some actual injury that is not *de minimus*, be it physical or emotional." *Id.* at 1208.

Lynch testified that she immediately began screaming that the handcuffs were too tight after she was cuffed and still on the ground.  She also testified that the hospital records show that after being transported there by EMS workers, she reported a tingling sensation in her left thumb and that a superficial abrasion on her wrist from the handcuffs was noted.  Both

complaints have since been resolved.  (Lynch depo. 69, 95) In an affidavit submitted with her

brief, Lynch avers

> 8. .... [the officers] put handcuffs on her so tight, her hands began to immediately lose
> circulation, which was verbalized numerous times...
>
> 9.  Affiant continued to yell about the handcuffs too tight in fear of losing the use of
> her hands permanently but they ignored her and forced her to stand and walk to the
> car...
>
> 10.  Affiant continued to yell that the handcuffs were cutting off her circulation and it
> felt like her wrist was cut and bleeding, but P.O. Oliver and P.O. Banach ignored her
> and left her in the police car, yelling and crying to see her daughter and that the
> handcuffs were too tight.  Two new police officers, Eduardo Colon and Jonathon
> Smith approached the police car affiant was in.
>
> 11.  Affiant, still crying from the pain, asked them to loosen the handcuffs and check
> for bleeding from her wrist and Smith said, 'Aw shoot,' while loosening the handcuffs
> with urgency.  He also verified affiant hands weren't bleeding, and then moved her to
> a car where her daughter Shaleah Combs was being held all the while.
>
> 12.  Affiant continued to complain of the pain in her wrists while verbalizing pain felt
> in her back and her forehead.  Affiant requested from the police officers to be taken to
> the hospital numerous times for medical treatment.
>
> 13.  Officer Oliver told affiant she was going to jail and would not receive any
> medical treatment.  A bystander called Cleveland EMS and after arrival on scene
> decided she should be transported to the hospital. ...

(Meshelle Lynch aff.)

For the following reasons, the Court does not find an issue of fact as to whether Oliver

committed a constitutional violation even though the Court assumes that Lynch suffered some

physical injury from the handcuffing.

As stated above, the Court must judge the reasonableness of Oliver's actions from the

perspective of the reasonable officer on the scene.  The Court considers the need for split-

second judgments- especially in "circumstances that are tense, uncertain, and rapidly

evolving." The situation was clearly one that was still uncertain as the officers were investigating the scene when Lynch arrived.  Although gunshots had been fired, the source had not been determined.  According to her own testimony, Lynch did not comply with Officer Oliver's instructions to move her car.  Rather, she told him not to "speak with me in that manner.. in that tone."  She also testified that while Oliver was still yelling at her, she "turned to walk off" and that she yanked her arm from Oliver and told him that "he is not to touch me." Plaintiffs argue in their brief, "The fact that [Lynch] turned away from Oliver when he cursed ... indicates she was in control and tried to avoid the further confrontation." (Doc. 53 at 7) Plaintiffs assert, without evidence, that Lynch actually turned toward her vehicle.  In fact, plaintiffs point to Durbin's testimony which does not support the assertion that Lynch had turned toward her Jeep when the officers grabbed her.  Thus, Oliver's testimony is undisputed that Lynch proceeded to walk into the crime scene when he grabbed her. When Oliver told Lynch to stop, she pulled away from him.  Banach and Oliver struggled with Lynch to handcuff and restrain her.

Plaintiffs argue that Oliver ignored Lynch's requests to loosen the cuffs immediately and after she was placed in the police car.  However, the evidence shows that immediately after Lynch was handcuffed, Oliver's attention was diverted by Mark Wright.  Even Lynch testified that Wright arrived as she was still on the ground.  (Lynch depo. 69-70) Oliver testified that after he and Banach got Lynch up off the ground, another officer took her to the zone car.  (Oliver depo. 45) Lynch testified that it was Banach who placed her in the police car after she got off the ground.  Regardless, Lynch does not dispute that Oliver did not walk her to the police car or place her in it. (*Id.* 71)  In the meantime, Oliver approached Wright,

who was yelling, and told him to return to his van. Oliver walked to the van with Wright and observed the peeled column.  Wright refused to show registration and identification to Oliver. Wright was arrested after he attempted to close the van door on Oliver. (Oliver depo. 45-47)

Plaintiffs further argue that the officers did not need to leave Lynch in the police car while converging on Wright because he submitted peaceably.  The evidence does not show that Wright was compliant.  Plaintiffs cite to Officer Smith's testimony who, in fact, stated that the male (Wright) was "disorderly."  Oliver testified that Wright was yelling while Oliver walked him back to his van.  Oliver also testified that Wright refused to put his hands behind his back and Oliver had to use force to handcuff and arrest him. Additionally, Durbin testified that Wright arrived on the scene and began yelling at the officers, and refused to give the officers his license and registration after they noticed that his steering column was peeled.

The evidence shows that the situation was chaotic, and potentially dangerous.  As a result, a reasonable officer in Oliver's situation would have prioritized his actions by arresting Mark Wright while another officer walked Lynch to the police car and placed her in it. Because it was reasonable that Oliver attend to Wright immediately, he did not commit a constitutional violation in not loosening Lynch's handcuffs while she was still on the ground. Additionally, because the evidence does not show that Oliver placed Lynch in the police car, he could not have adjusted her handcuffs then. Plaintiffs complain that Oliver did not go back to the police car to check Lynch's handcuffs.  But, the evidence shows that after Officers Smith and Colon assisted in the arrest of Wright, who was arrested immediately after Lynch, they returned to the police car and loosened Lynch's handcuffs. Oliver began to run Lynch's and Wright's license plates immediately after their arrests.  (Ex. D-1) It was at that point that

Xavier Lynch arrived and confronted Oliver, contributing to the "rapidly evolving" situation and further distracting Oliver.

For the foregoing reasons, Oliver did not commit a constitutional violation and he is entitled to qualified immunity on the excessive force claim.

### (b)  plaintiff Lynch- false arrest

The Fourth Amendment is not violated by a warrantless arrest "where there is probable cause to believe that a criminal offense has been or is being committed. The validity of the arrest does not depend on whether the suspect actually committed a crime. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Brooks v. Rothe*, --- F.3d ----, 2009 WL 2568189 (6th Cir. August 21, 2009) (citations omitted).

As plaintiffs point out, Ohio law prohibits the purposeful obstruction or delay of the performance of a public official's lawful duties.  *See* O.R.C. § 2921.31. Although plaintiffs argue that Lynch did not obstruct official business when she arrived to retrieve her minor child and did not have the intent to obstruct the police, Lynch's intent is irrelevant.  The facts and circumstances would warrant any reasonable officer to believe that Lynch did obstruct official business.  As discussed above, Lynch yelled at the officers and failed to follow Oliver's instructions to move her Jeep upon arriving at a situation under investigation.  She ignored Oliver's command to not proceed into the crime scene and yanked away from him when he tried to stop her.

As Lynch's arrest did not lack probable cause, no constitutional violation occurred.

### (c) plaintiff Lynch- malicious prosecution

22

Plaintiffs allege a state law claim for malicious prosecution.  (Compl., Pendent Causes of Action ¶ 27) Plaintiffs now seem to assert that the malicious prosecution claim is a federal claim brought under § 1983.  (Doc. 53 at 18-19).  Plaintiffs contend that Lynch was maliciously prosecuted by the City of Cleveland when she was re-charged with Aggravated Disorderly Conduct after the original charges were dismissed.

The City of Cleveland cannot be held liable because, as discussed below, plaintiff has not demonstrated that the alleged injury was a direct result of the city's official policy or custom.

### (d) plaintiff Combs- unlawful arrest and assault and battery

"A person who has been the victim of an unlawful arrest or wrongful seizure under the color of law has a claim based on the Fourth Amendment guarantee that government officials may not subject citizens to searches or seizures without proper authorization." *Brooks v. Rothe,* --- F.3d ----, 2009 WL 2568189 (6th Cir. August 21, 2009) (citations omitted). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Id.* (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Id.* (citing *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir.2002)).

The assault and battery claim arises under state law but can be resolved for the same reasons addressed here.

Plaintiffs assert that Oliver and Banach arrested Shaleah without a warrant and without probable cause.  In particular, plaintiffs contend Shaleah was unlawfully arrested

because of her race as evidenced by Banach referring to her as a "little black bitch."

Plaintiffs also contend that Banach's actions toward Shaleah resulted in assault and battery.

As demonstrated by Shaleah's deposition testimony, Officer Banach placed her in the police car and used the racial epithet.  (Combs depo. 31-33) Officer Oliver testified that he yelled over to, or instructed, Banach or another officer to place Shaleah in the police car. Oliver stated that he was not involved in putting her in the car.  (Oliver depo. 15-16, 72, 44).

Banach has not been served with the Complaint.  Because there is no evidence that Oliver took the actions alleged to have amounted to an unlawful arrest or assault and battery, summary judgment is warranted on this claim.

### (iii) McGrath

Defendant McGrath was the Chief of Police for the City of Cleveland at the time of the incident.  Plaintiffs present no argument or evidence that he had any direct participation in the incident.  Therefore, for the reasons discussed above with regard to defendant Durbin, summary judgment is warranted in McGrath's favor.

### (b) Municipal Liability

Where there is no underlying constitutional violation by the City's officers, the claims against the City are properly dismissed.  *Ryan v. Hazel Park,* 279 Fed.Appx. 335 (6th Cir. 2008). Even assuming a constitutional violation by the individual officers, under § 1983 a municipality can only be held liable if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom. *Slusher v. Carson*, 540 F.3d 449 (6th Cir. 2008) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978); *Cummings v. City of Akron*, 418 F.3d 676, 684-85 (6th Cir.2005) (citing *City of Canton v.*

*Harris*, 489 U.S. 378, 385 (1989)).  Plaintiffs have presented no discussion of any such policy or custom.

The City of Cleveland is entitled to summary judgment in its favor.

**<u>Conclusion</u>**

For the foregoing reasons, defendants City of Cleveland, Michael McGrath, Albert D. Oliver, and Robbie L. Durbin's Motion for Summary Judgment is granted and defendants' Motion to Strike is granted in part.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 9/30/09

25